**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL JON BARBARULA, Administrator of the Estate of Jing Xian He, | : : : : | CIVIL ACTION NO. 3:02 CV 1142 (EBB) |
| vs. | : : : | |
| CANAL INSURANCE COMPANY, et al. | : | SEPTEMBER 1, 2004 |

### SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to the court's order, the undersigned filed the FOIA material without briefing or argument as to its significance. Canal then filed an objection to the filing arguing that the plaintiff should not have complied with the court's request to file the FOIA materials. The materials are properly filed and further support the plaintiffs' claim of coverage in this case. Canal's argument in response to those filings has no legal merit. In addition, to fully address Canal's argument that despite the Federal Regulations and the language of its policy requiring notice to the ICC or its successor agency, no cancellation was required to be forwarded to the ICC or its successor agency, the plaintiff submits this brief on the issue.

Pursuant to the MCS-90 endorsement attached to the subject policy, Canal must give both the ICC and the insured notice of any cancellation of the policy. This never happened. Most important, however, is that Canal's annexation of the endorsement to the policy is alone evidence that Canal, itself, knew that Salguod was an interstate for hire motor carrier subject to the regulation of the ICC.

1

As set forth below, the MCS-90 endorsement was in full effect subsequent to the ICC Termination Act, 49 U.S.C. §§ 13901-13905, at the time when Canal attempted to cancel Salguod's policy and at the time of the crash that killed the plaintiff's decedent. In fact, the Act itself makes it clear that all existing regulations, including all contained in the MCS-90 endorsement, would be in effect until the new Surface Transportation Board had a chance to review these rules and regulations and make changes. Moreover, the Termination Act expressly states that all references to the ICC would now be deemed to refer to the Surface Transportation Board ("STB"), with the Federal Highway Administration ("FHWA") in charge in the interim period.

Interestingly, if one follows the history of the notices published in the Federal Register, it is very clear that Canal was aware of the continued viability of the MCS-90 endorsement. The original policy in this case was issued in February 1996 without the required MCS-90 endorsement. Then on March 25, 1996, the DOT issued orders notifying all carriers and insurers through the Federal Register that all ICC rules and regulations remained in effect under the direction of the STB. See 61 F.R. 14372 (Mar 25, 1996). On March 26, 1996, one day later, Canal amended the subject Salguod policy (and presumably all of its policies) and added the MCS-90 endorsement.

From the FOIA documents and the Federal Register it is clear that the federal agency that took over for the ICC in the interim period, with regard to compliance with MCS-90 requirements, the FHWA, is the *same exact* agency that issued the unsatisfactory safety ratings to Salguod and **ordered** Salguod to obtain and provide to the government "[a] properly executed copy of From MCS-

2

90 endorsement . . . ." Exhibit A at 5, ¶ 3. Moreover, the agency that was in charge of enforcing the regulations issued two claim letters to Salguod, see Exhibits B & C (dated May 6, 1996 and August 1, 1996, respectively - well before the crash), identifying numerous violations by this interstate carrier that required abatement so as to avoid danger to the travelling public. The agency is further charged with mandating that the MCS-90 endorsement is in place for all for-hire motor carriers, as it did with Salguod. See 61 F.R. 43816 (Aug. 26, 1996). It is clear from these letters that regardless of the unscrupulous nature of Salguod's business practices, the Federal Government knew that Salguod was an interstate carrier and had violated the law.

Moreover, prior to the crash the Federal Register was absolutely clear on how insurance filings were to be handled. The following was published for the the trucking industry and their insurers to review prior to the crash in this matter: "As a result of the Act, Congress terminated the ICC and transferred to the FHWA the functions concerning the ICC's remaining licensing and financial responsibility requirements. But the Act converted the former operating authority/permit system of the ICC into a registration/licensing system and, essentially, adopted the parameters of the ICC's then current insurance filing and monitoring system into this registration system." 61 F.R. 43816, 43817 (Aug. 26, 1996).

Canal admits it did not comply with the cancellation provisions of the endorsement, but claims it does not matter because Salguod, a rogue carrier, did not follow the law and register with the ICC. That argument is specious since the purpose of the MCS-90 endorsement is to protect the public against dangerous,

3

unscrupulous motor carriers like Salguod, see Reliance Ins. Co. v. Royal Indemnity, No. 99 Civ. 10220(NRB), 2001 U.S. Dist. LEXIS 12901, at *22, 28-29 (S.D.N.Y. Aug. 24, 2001), and the provisions of law apply whether or not the unscrupulous motor carrier is registered with the ICC since "the Interstate Commerce Act is a highly remedial statute and its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of transportation of property on the public highways for hire." Id. at *13-14.

Since Salguod was subject to ICC regulation[1] by virtue of the nature of its business which was well known to the federal government and the FHWA, Canal should be required to indemnify as a surety under the MCS-90 endorsement since the prerequisites of liability are established. Id. at *28-*29 (liability under MCS-90 applies where there is 1. final judgment against insured; 2. arising out of negligent operation of motor vehicle). Thus, the fact that Salguod is a law-breaker does not save Canal.

Canal also argues that the cancellation provisions requiring notice to the ICC or a successor agency were no longer applicable because of the ICC Termination Act of 1995. This is contrary to law and fact. See 61 F.R. 43816, 43817 (Aug. 26, 1996) (indicating that the FHWA took over for the ICC with

---

[1] The MCS-90 endorsement contains financial responsibility provisions and requires that "cancellation of this endorsement may be effected by the company or the insured by giving (1) thirty-five days notice in writing to the other party (said 35 days to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice) and **(2) if the insured is subject to the ICC's jurisdiction, by providing thirty (30) days notice to the ICC** . . . ." (Emphasis added).

respect to insurance filings and that § 204 of the Termination Act maintained the "status quo"). Canal's wrong-headed argument completely ignores the Savings Clause of § 204 of the Termination Act, and the text of the Federal Regulation cited above, that preserved, and put Canal on notice prior to this crash, all of the ICC rules and regulations, to be enforced by the FHWA until the Surface Transportation Safety Board could hold rulemaking sessions to determine if changes were necessary.

As such, the financial responsibility requirements and notice provisions of MCS-90 were in full effect throughout the policy period. Furthermore, the plaintiff was well aware of that fact since this endorsement MCS-90 was added after the Termination Act of 1995 was implemented and the attempt at canceling the policy occurred after the publication of the status of the various agencies and rules in the Federal Register.

In 1954, Congress enacted 49 U.S.C. § 10927 to provide protection for the public by ensuring that trucks engaged in interstate commerce were independently financially responsible. See Reliance Ins. Co., supra; 61 F.R. 43816 (Aug. 26, 1996). Pursuant to that statute, the ICC promulgated regulations imposing financial responsibility requirements on motor carriers. The financial responsibility requirement covered matters such as the type of insurance, limits of insurance, and a series of mandatory forms with which motor carriers were required to conform. See 49 C.F.R. § 1043.1(a)(1).

These ICC regulations also prescribed that a certified insurance policy contain an Endorsement for Motor Carrier Policies of Insurance for Automobile Bodily Injury and Property Damage under 49 U.S.C. § 10927. This special

5

endorsement was commonly referred to as the *BMC 90 Endorsement*. 49 C.F.R. § 1043.7(a)(3).

In addition to these ICC regulations, motor vehicles with a gross weight of 10,000 pounds or greater were also subject to the Department of Transportation's regulatory jurisdiction. See 49 C.F.R. § 387.3(c)(1); 61 F.R. 43816, 43817 (Aug. 26, 1996). Like its ICC counterpart, the DOT regulations prohibited a motor carrier from transporting property unless it had met certain financial responsibility requirements. 49 C.F.R. §§ 387.7; 387.9. Pursuant to Section 30 of the Motor Carrier Act of 1980, the DOT established regulations creating a minimum level of insurance for vehicles over 10,000 pounds. See 49 C.F.R. § 387.9(1). Further, under the DOT regulations, insurance policies were required to have the MCS-90 endorsement. 49 C.F.R. § 387.15. The MCS-90 endorsement was designed to satisfy the ICC's regulations and the DOT's regulations simultaneously, obviating the need for obtaining the BMC 90 endorsement once the MCS-90 Endorsement had been acquired. See Empire Fire and Marine v. Liberty Mutual Insurance Company, 699 A.2d 482 (Md. App. 1997) (describing the historical background and surveys the regulatory history); 61 F.R. 43816, 43817 (Aug. 26, 1996) (same).

As stated above, the regulatory history shows that motor carriers of property were historically regulated both by the Interstate Commerce Commission and the DOT. As such, the ICC and the DOT had concurrent regulatory jurisdiction over vehicles weighing 10,000 pounds or more. This dynamic changed on January 1, 1996 when the ICC was abolished. As explained below, however, the only change was that all of the ICC functions were

6

transferred to the DOT and the FHWA and then finally to a body called the Surface Transportation Board.

The ICC Termination Act of 1995 abolished the Interstate Commerce Commission and established the Surface Transportation Board within the Department of Transportation. Public Law 104-88, 109 Stat. 803, 29 December 1995. See 49 U.S.C. § 13906. Pursuant to this Termination Act, the existence of the ICC ended on January 1, 1996.

Even though the ICC was terminated, all of its rules and regulations remained in place and its powers and duties were taken over in the interim period by the FHWA. 61 F.R. 43816, 43817 (Aug. 26, 1996). Section 204 of the Act is the savings provision mandating that:

> all orders, determinations, rules and regulations: (1) that have been issued, made, granted, or allowed to become effective by the Interstate Commerce Commission ... in the performance of any function that is transferred by the Act or amendments made by this Act; and (2) that are in effect on the effective date of the transfer... shall continue in effect, according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the Board, any authorized official, a court of competent jurisdiction, or operation of law.

Section 205 of the Act states that any reference to the ICC in federal statutes, rules, or regulations is now deemed to refer to the Surface Transportation Board, but in the interim period the FHWA was in control.

Canal posits that the MCS-90 endorsement attached by it to the policy on March 26, 1996 became mere surplusage and was not in effect because the ICC was abolished on January 1, 1996. The savings clause makes it clear that Canal's argument has no basis. In fact, the DOT reiterated this fact on March 25, 1996, just one day before Canal amended the policy to include the MCS

7

endorsement and again in 61 F.R. 43816 (Aug. 26, 1996). Public notice was given in the Federal Register, 61 F.R. 14372, on March 25, 1996, that the Act preserved all effective ICC regulations, rules, and decisions until the Secretary finds modification of these documents warranted, thereby preserving the status quo in the interim.

As set forth in Nissenberg, The Law of Commercial Trucking at 733 (Lexis Law Publishing 1998), following the Termination Act of 1995 the "DOT's financial responsibility and insurance regulations mandating the use of the form MCS-90 endorsement are in effect and cover all motor carriers with a GVWR of 10,000 pounds or more." Further, as stated in the Federal Register, "[t]he savings provisions in Section 204 of the Act preserved all effective ICC regulations, rules and decisions until the Secretary finds modification of these documents warranted, thereby preserving the status quo for the interim. The FHWA gave public notice of the continued effectiveness of these ICC documents in 61 F.R. 14372 (April 1, 1996)." 61 F.R. 43816, 43817 (Aug. 26, 1996). Thus, it was common knowledge in the industry that the ICC did not simply vanish and take with it to the grave all of its rules and regulations so unscrupulous motor carriers (and by implication their insurance carriers) could wreak havoc on the roadways. The FHWA was now in control.

The MCS-90 endorsement is required to be attached to any liability policy issued on behalf of for-hire motor carriers operating motor vehicles transporting property in interstate commerce. See 49 C.F.R. §§ 387.3 and 387.7. This endorsement also nullifies or negates limiting provisions in the policy, including less stringent notice of cancellation requirements. Liberty Mutual Ins. Company

8

v. States, 940 F.2d 1179 (8th Cir. 1991). The requirement in the endorsement that notice be given to the ICC/DOT/FWHA of cancellation is part of a federal regulation. 49 C.F.R. § 387.15 requires the insurer to give 30 days notice to the ICC/DOT/FWHA on the prescribed form. This never happened.

Under the Termination Act, the status quo was maintained and all existing rules and regulations of the ICC were transferred to the surface Transportation Board or the interim agency enforcing the law, the FHWA. Given that Canal admits it did not send the required notice, the plaintiff's motion for summary judgment should be granted.

THE PLAINTIFF

By: _____
Joel T. Faxon
STRATTON FAXON
59 Elm Street
New Haven, CT. 06510
Telephone (203) 624-9500
E-Mail jfaxon@strattonfaxon.com
Federal Juris No. CT 16255

9

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on this day to:

John W. Dietz, Esq.
Halloran & Sage
315 Post Road West
Westport, CT 06880

John W. Mills, Esq.
Murphy and Karpie
350 Fairfield Avenue
Suite 408
Bridgeport, CT 06604

_____
Joel T. Faxon