UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Sep 29  3 34 PM '04

U.S. DISTRICT COURT

MICHAEL BARBARULA,         :
Administrator of the Estate :
of Jing Xian He,            :
                            :
                            :
        v.                  :    3:02-CV-1142 (EBB)
                            :
                            :
CANAL INSURANCE COMPANY,    :
ROYAL INSURANCE COMPANY OF  :
AMERICA, ROYAL INDEMNITY    :
COMPANY and ROYAL SURPLUS   :
LINES INC. CO.              :

## RULING ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DEFENDANT CANAL'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT, and DEFENDANTS THE ROYAL COMPANIES' MOTION FOR SUMMARY JUDGMENT

Michael Barbarula, Administrator of the Estate of Jing Xian He, ("Plaintiff" or "Barbarula"), moves the Court for Partial Summary Judgment against Canal Insurance Company ("Canal") as to the validity of a so-denominated "MCS-90" endorsement to Canal's insurance policy (the "Policy"), at issue herein. [Doc.No.40]. [1]/ Plaintiff contends that this obligatory federal endorsement, the MCS-90, mandates that the Policy call for payment to him of

---

[1]/ As to Canal, "[t]he plaintiff has only moved for summary judgment as to Counts I, II, and III to the extent: 1. that the MCS-90 endorsement in the policy requires payment by Canal to the plaintiff; and, 2. the amount of the payment under the policy requires payment of the face amount [of] $1,000,000.00, plus any applicable 'additional payments' (i.e. offer of judgment interest under General Statutes § 52-192a, post judgment interest under General Statutes § 37-3a, costs, and the like) due under the policy. The plaintiff is not seeking summary judgment, at this time, as to the bad faith claim or other allegations that would permit the plaintiff to obtain full and complete compensation from Canal for its extra-contractual handling of the claim." Plaintiff's Memorandum of Law at 5-6, n.1 (September 29, 2003).

1

Canal's Policy obligations, inasmuch as Canal's Policy was not timely canceled under federal law at the time of the fatal accident herein.

Concomitantly, Canal has filed a Second Motion for Summary Judgment, [Doc.No.38], asserting that "[i]t can not be disputed that a prior court has already ruled that the insurance policy issued by Canal was properly cancelled prior to the subject accident. As the insureds have no present right under the policy, the Plaintiff's derivative claim pursuant to C.G.S §38a-321 must also fail." [2]/ Defendant Canal's Memorandum of Law in Support of Second Summary Judgment, at 3. (October 1, 2003). With regard to the bad faith claim brought against it, Canal postulates that, inasmuch as the Policy had been cancelled prior to the subject accident and prior to the initiation of the wrongful death case which followed, there was no duty for Canal to settle the case or to protect the legal interests of its insureds under the Policy.

Finally, Royal Insurance Company of America, Royal Indemnity Company, and Royal Surplus Lines, Ins. Co. [3]/ move for summary judgment, also against the claims of Plaintiff herein. [Doc.No. 26]. A&F premises its motion on the fact that, as a matter of

_____

[2]/ Connecticut's "Direct Action Statute", subrogating the right to maintain an insurance claim directly by the injured party.

[3]/ The policy at issue was actually written by American and Foreign Insurance company ("A&F"), which is a member of the Royal Group, Inc. Rather than have the case dismissed for failure to sue the correct party, Plaintiff, with the agreement of Royal, refers to the correct party in his memorandum of law. The Court will, accordingly, refer to the Royal Defendants as "A&F".

Connecticut law, a contingent coverage endorsement to the A&F Policy herein limits coverage to the minimum required by such law, or $20,000.00. *See, in pertinent part,* Conn.Gen.Stat. §14-112(a). Accordingly, A&F asks this Court to enter judgment in favor of Plaintiff for $20,000.00.

## INTRODUCTION

Excellent presentations of the historical facts in this case are to be found in the opinions in <u>Canal Ins. Co. v. Haniewski</u>, CV 0417942 (Conn.Super.Ct.)(Blue, J.) *Memorandum of Decision* (November 13, 2001) and <u>Barbarula v. Canal Insurance Co.</u>, 3:02-CV-1142 (JCH) *Ruling on Canal Insurance Company's Motion for Summary Judgment* (September 11, 2003). This Court assumes familiarity with those Opinions and hereby incorporates them by reference. This Court will briefly address the relevant facts.

### A. **Barburala and Canal**

On September 12, 1996, at 6:31 p.m., a tractor-trailer truck driven by Carlos Reummele ("Reummele"), as a driver for Barbara Haniewski, d/b/a Salguod Warehouse and Transport ("Haniewski" or "Salguod"), was involved in a fatal accident - - eighteen hours and thirty minutes after a policy of insurance issued by Canal to Haniewski had been cancelled, due to non-payment. The trailer attached to Salguod's truck had been leased from an entity known as Eagle Leasing ("Eagle").

The original litigation arising out of such accident was

3

filed in state court in early July, 1997, in which the Plaintiff
sued Haniewski, d/b/a/ Salguod, and Reummele, for wrongful death.
Barbarula v. Haniewski, No. CV97 0437585 S (Conn.Super Ct.1997).
Eagle was not a defendant in that action.  On November 29, 2001,
after a jury trial at the New Haven Superior Court, a verdict was
returned in Plaintiff's favor, in the amount of $5,700,000.00
(Honorable Jon C. Blue). Plaintiff's verdict was not entered as a
judgment until April 23, 2002 (Robinson, R, J).  The final
judgment was comprised of a verdict of $3,600,000.00 and offer of
judgment interest of $2,100,000.00. [4]/  To date, the judgment has
not been paid.

Prior to the jury trial of the matter, on September 15,
1998, Canal filed a declaratory judgment action, naming as
defendants Haniewski, Reummele, and Eagle, the persons and
entities covered by an MCS-90 endorsement to Salguod's insurance
policy.  Canal Insurance Co. v. Haniewski, CV98 0417942 S
(Conn.Super.Ct.)(Blue, J).  Canal sought to, first, be absolved of
the duty to defend and, second, be absolved of the duty to
indemnify Haniewski, Reummele and Eagle.

Third, Canal sought a declaration of the substantive
effects, if any, of the federally required MCS-90 endorsement
attached to, and incorporated into, the Canal policy issued to
Salguod.

---

[4]/ Pursuant to Section 37-3b of the Connecticut General Statutes, the
Plaintiff is entitled to post judgment interest on the total amount of the
judgment at the rate of 8% running from the date of judgment. See Gionfriddo
v. Avis-Rent-A-Car, 192 Conn. 301, 308 (1994)(calculation of interest).

Last, Canal's fourth declaratory request asked for
"reimbursement of costs and attorney's fees spent in connection
with this matter."

In the end, Judge Blue determined to respond to two of the
four inquiries put to him. First, he declared that, due to timely
cancellation of the Policy under state law, Canal had no duty to
defend the original, underlying action. Second, inasmuch as it
had prevailed on the duty to defend claim, Canal was owed costs
from Haniewski, Reummele, and Eagle.  Plaintiff was not, however,
entitled to any attorney's fees. *Memorandum of Decision*, November
13,2001, at pp. 10-11.  Judge Blue determined not to rule on the
issue of indemnity.  *Id.*

He also deferred decision with regard to the issue of the
MCS-90 endorsement, as the repercussions of the MCS-90 mandates,
if any, were to be answered by the federal court. *Id.* at 10.

## LEGAL ANALYSIS

### I.    The Standard of Review

In a motion for summary judgment the burden is on the moving
party to establish that there are no genuine issues of material
fact in dispute and that it is entitled to judgment as a matter
of law.  Fed. R. Civ. P. 56(c).  *See also* <u>Anderson v. Liberty
Lobby</u>, 477 U.S. 242, 256 (1986)(plaintiff must present
affirmative evidence in order to defeat a properly supported
motion for summary judgment).

If the nonmoving party has failed to make a sufficient

5

showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. Accord, Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d. Cir. 1995)(movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), cert. denied, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." Anderson, 477

U.S.at 247-48 (emphasis in original).

II. **The Standard As Applied**

On May 4, 2004, the Supreme Court of Connecticut issued a

decision, which is determinative, in part, of the present

litigation between Plaintiff and Canal herein. DaCruz v. State

Farm Fire & Casualty Co., 268 Conn. 675 (May 2, 2004)("DaCruz

III").

In DaCruz I, as in the present case, plaintiff had secured a

judgment against the named insured. State Farm, defendants'

insurer, filed a Declaratory Judgment action in DaCruz I,

asserting that it had no duty to defend or indemnify a defendant

who was alleged to have assaulted DaCruz, based on exclusionary

language in the State Farm policy at issue therein.  The trial

court, Blue, J.[5]/ granted, in part, State Farm's declaratory

judgment requests and issued such judgment with respect to

State's Farm's claim that it had no duty to defend, based on such

exclusionary language. As in the present case, Judge Blue did not

decide whether there was a duty to indemnify.

As a result of Judge Blue's decision, State Farm refused to

pay DaCruz's judgment against its named insured.

Thereafter, the plaintiff filed motions for default against

the primary defendants, which were granted by Superior Court

Judge Curren.  After a hearing on damages, Judge Curren entered

---

[5]/ The Honorable Jon Blue was also the trial judge in the present
action.

7

judgment in favor of DaCruz.

DaCruz then brought a separate action against State Farm under the direct action statute, Conn.Gen.Stat., § 38a-321.  On cross-motions for summary judgment, the Court (Levin, J.), found in favor of State Farm, granting its motion, and denying plaintiff's.  Plaintiff appealed this decision.

The Appellate Court concluded that, "[b]ecause the judgment rendered in the DaCruz [I] action was based on negligence in part, [the plaintiff] would have had a viable contractual claim against State Farm.  Therefore, the plaintiff may recover against State Farm pursuant to § 38a-321, as a matter of law." DaCruz v. State Farm Insurance & Casualty Co., 69 Conn.App. 507, 516 (Conn.App. 2002)("DaCruz II").  It, therefore, reversed the trial court and sent the case back for another hearing on damages.

The Supreme Court granted State Farm's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the plaintiff may recover against [State Farm] pursuant to . . . § 38a-321 as a matter of law ?" DaCruz v. State Farm Fire & Casualty Co., 261 Conn. 938 (2002).  The Supreme Court answered the certified question in the negative. DaCruz v. State Farm & Casualty, 268 Conn. 675 (2004) (DaCruz III).

In DaCruz III, the Supreme Court held that:

> There is no dispute that the issue of
> State Farm's duty to defend Bullock
> in the DaCruz [I] action was fully
> and fairly litigated by the plaintiff,
> who vigorously opposed State Farm's
> claims in the State Farm action. Thus,

8

> under principles of collateral
> estoppel, the plaintiff is barred from
> relitigating, in the present action,
> any issues that were actually and necessarily
> determined in the State Farm action. **We
> conclude that the judgment of the trial
> court, Blue, J., declaring that State
> Farm had no duty to defend Michael Bullock
> in the DaCruz action, actually and necessarily
> determined that State Farm also had no duty
> to indemnify.**

DaCruz III, 268 Conn. at 687 (emphasis added). *See also Id.*

at 687-79.

It is well-settled that the duty to defend is triggered

whenever a complaint alleges facts that potentially could fall

within the scope of the coverage, whereas the duty to indemnify

arises only if the evidence adduced at trial establishes that the

conduct actually was covered by the policy. Because the duty to

defend is significantly broader than the duty to indemnify,

"where there is no duty to defend, there is no duty to indemnify.

. . ." *Id.* at 688. *Accord* EAD Metallurgical, Inc. v. Aetna

Casualty & Surety Co., 905 F.2d 8, 11 (2d Cir. 1990)(no duty to

defend necessarily means no duty to indemnify).

The present case is controlled, in part, by the DaCruz III

decision. This Court follows the mandatory authority of that

case and holds that, under state law, Canal was not obligated to

defend and/or indemnify Haniewski, and/or Reummele and/or Eagle.

However, that is not the end of the inquiry, as Judge Blue

specifically, and correctly, noted that, "`[f]ederal law applies

to the operation and effect of the ICC-mandated endorsements.' It

9

is common ground that the MCS-90 is an ICC-mandated endorsement
and must be construed according to federal law." *Memorandum of
Decision,* at p.5 *quoting* <u>Harco National Insurance Co. v. Bobac
Trucking, Inc.</u>, 107 F.3d 733, 735 (9th Cir. 1997). "[T]he MCS-90
endorsement provides broader coverage than the insurance policy
to which it is attached and . . . is interpreted under federal,
not state, law." <u>Green v. Royal Indemnity Company</u>, 1994 WL 267749
(S.D.N.Y. June 15, 1994) *citing to* <u>Canal Insurance Co. v. First
General Insurance Co.</u>, 889 F.2d 604, 610 (5th Cir.1989)("The
operation and effect of ICC-mandated endorsements are a matter of
federal law."). *Accord,* <u>In re Yale Express Systems, Inc.</u>, 362
F.2d 111, 114 (2d Cir. 1966).

Further, "[t]he language of the MCS-90 is contained in a
federal regulation adopted pursuant to statutory authority and,
as such, has the force of law." <u>American Alternative Insurance
Company v. Sentry Select Insurance Company</u>, 176 F.Supp.2d 550,
554 (E.D.Va. (2001).

The purpose of the Federal Motor Carrier Act of 1980
("FMCA"), and the regulations promulgated pursuant thereto,
especially the MCS-90, were designed to stem the unregulated use
of vehicles in interstate commerce, which threatened public
safety. <u>Integral Insurance Company v. Lawrence Fullbright
Trucking</u>, 990 F2d 268, 261 (2d Cir. 1991). *See also,* <u>Transamerica
Freight Lines v. Brada Miller Freight Systems, Inc.</u>, 423 U.S. 28,
37 (1975)("significant aims" of federal rules regulating motor

carriers is to eliminate "attendant difficulties". . . .of fixing financial responsibility for damage and injuries to . . . members of the public.) *Accord* American Alternative, 176 F.Supp.2d at 556 (MCS-90 should be construed and applied to protect members of the public injured by interstate motor carriers from uncompensated losses - - by mandating coverage where there would otherwise be no coverage). "A motor carrier of property has a duty under federal law to guaranty its financial responsibility for injuries to the public. Purchasing coverage under an MCS-90 endorsement is one way for a carrier to fulfill this duty." Harco National Insurance Company v. Bobac Trucking et al, 1995 WL 482330 at * 4 (N.D.CA. 1995).

*See also* Canal v. First General, 889 F.2d at 611, wherein Canal acknowledged that the MCS-90 obligated it to pay third-party judgments rendered against its insured, subject to reimbursement by the insured.

There is no doubt that when Haniewski filled out the Application for insurance from Canal, she left blank those sections which inquired as to whether Salguod had to be registered with the ICC or the DOT, negating such registration.[6]/

---

[6]/ On February 29, 1996, a lieutenant of the Wallingford Police Department contacted the Office of Motor Carriers, Federal Highway Administration. He requested an investigation into Salgoud, as a prior investigation of a four vehicle accident with injuries caused by a Salgoud driver on February 15, 1996, revealed that the tractor was unregistered and had a misused registration plate on it.  The motor carrier, hauling hazardous materials interstate, was uninsured, as was Salgoud in general, for failure to pay an earlier insurance carrier. (On Haniewski's Application to Canal, she averred that the company had never had insurance canceled ).  In April, 1996 a

She also provided no ICC or DOT docket or permit number when she filled out the Application. This determination of "no filings" was confirmed in a telephone call between Salguod's producing agent and a representative of Canal. Nevertheless, Canal **knew** that it was insuring an interstate motor carrier. The policy issued by Canal insured Salguod for a radius of "UNLIMITED within policy territory." "Policy territory" is defined, in pertinent part, to mean "(1) the United States of America, its territories or possessions, or Canada . . . ." *See* Canal Policy Number 309923 at 1 and Definitional Section VI at 2-3. *Cf.* Howard v. Quality Express, 128 N.M. 79, 81 (Ct.App.N.M.1999)(insurance company had no liability inasmuch as it had no knowledge of interstate travels until depositions of owner and member of board of directors; policy issued for intrastate travel only upon insured's request; accordingly, no MCS-90 endorsement ever requested).

Hence, there can be no doubt that, at all times pertinent herein, Salguod was an interstate motor carrier engaged in interstate commerce within the meaning of 49 C.F.R. Ch. III, §

---

DOT inspection found interstate motor carrier Salgoud to be in serious non-compliance with federally-mandated safety regulations including, *inter alia*, failure to possess an MCS-90 endorsement. Indeed, the Salguod motor carrier was transporting a hazardous material without registering with the DOT. *See* Federal Motor Carrier Safety Administration ("FMCSA") Enforcement Report Cover Sheet, investigation completed March 26, 1996; Investigation # CT-96-030-CT0074. As of November 25, 1996, the Connecticut Department of Motor Vehicles suspended Salgoud's registration privilege. Letter of Lt. Alan Zakrzewski, Wallingford Police Department, to Mr. Fran Foley, Office of Motor Carriers, Federal Highway Administration (February 29, 1996 at 1).

390.5, subpart B.  In that definitional subpart it provides that
"*interstate commerce* means trade, traffic, or transportation in
the United States (1) between a place in a State and a place
outside such State . . . (2) between two places in a State
through another State . . . ." Also pursuant to that subsection,
*motor carrier* "means a for-hire motor carrier . . . . " and a
*for-hire carriage* means "the business of transporting, for
compensation, the goods or property of another."  *See also* 49
C.F.R. Ch. III, § 387.5  These definitional terms are the
equivalent of those found in the Canal policy.

Also, Reummele advised the police who arrived at the scene
of the fatal accident that his pick-up and delivery route for
that date included two stops in Massachusetts, after which he
returned to Connecticut through Rhode Island. Reummele's
interstate routes, as assigned by Salguod, solidly serve to
buttress this Court's finding that Salguod was, indeed, operating
as an interstate motor carrier in violation of federal law. *See
also* Statement of Investigating State Trooper, Dec. 30, 1996 at
9:00 a.m, p. 1 of 1 "On the above date/time, GA 10 returned the
warrant [for Ruemmele's arrest].  The warrant was lacking an
element for the log violation in that I failed to mention that
**the truck was 10,000 lbs. and used in interstate commerce.** The
information was added and the warrant returned to GA 10.  Upon
its return I will execute the warrant and close out this case."
On January 10, 1997, this same trooper filed a continued

13

statement: "On January 9, 1997, GA 10 returned the warrant I
applied for. The warrant is signed by the judge." Thus, an
independent judicial officer determined that Salgoud was indeed
an interstate motor carrier.

On the same date that the above-referenced DOT investigation
of Salguod was completed, March 26, 1996, Canal received a fax
from Salguod's agent requesting an MCS-90 filing "ASAP" and
providing a DOT registration number. Canal provided the MCS-90
endorsement. Thus, as of that date, at the latest, Canal knew
that it was now required to comply with the statutory and
regulatory mandates of the requirements of an MCS-90 endorsement,
as a matter of federal law. A *fortiori*, this includes the
dictates of a proper notice of cancellation under the MCS-90.
"Cancellation of this endorsement may be effected by the company
or by the insured by giving (1) thirty five (35) days notice in
writing to the other party (said 35 days to commence from the
date the notice is mailed, proof of mailing shall be sufficient
proof of notice), and (2) if the insured is subject to the ICC's
jurisdiction, by providing thirty (30) days notice to the ICC
(said 30 days notice to commence from the date the notice is
received by the ICC at its office in Washington, D.C.)." MCS-90,
final paragraph. However, Canal provided no notice of such
cancellation to any federal agency governing interstate motor
carriers, regardless of the fact that it had issued an MCS-90 to
Salguod.

Under the FMCA, sections 29 and 30, Public Law No 96-296, 94

14

Stat. 793, July 1, 1980, commercial motor carriers engaged in interstate commerce were required to register with the DOT and comply with minimum financial responsibility requirements established by the DOT.  The DOT next required a specific form which "must be included in any insurance policy to satisfy the registration and financial responsibility requirements."  49 C.F.R. §§ 387.7(a) and 387.9.  The form devised by the DOT was the MCS-90 endorsement.  Such endorsement is usually referred to as an "ICC endorsement" because its form was adopted verbatim from the DOT MCS-90, and was prescribed under statutes delegating some of the DOT enforcement provisions to the ICC. The endorsement, however, is entitled "Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980."  As noted above, this Act required DOT compliance, later delegated to the ICC, which adopted the MCS-90 verbatim, as created and mandated by the DOT. The ICC's authority to regulate motor carriers was transferred to the Surface Transportation Board ("STB"), a division of the DOT, effective January, 1996. *See*  49 U.S.C. § 13501 *et seq.*, The original DOT/ICC regulations, including the requirement of the MCS-90, remained in effect until new regulations were promulgated, which regulations were not yet promulgated at the time of this accident; thus, the MCS-90 remained subject to the DOT jurisdiction.[7]/

_____

[7]/  When the STB regulations were finally promulgated, the MCS-90 was adopted in whole and, hence, was a binding requirement of the STB.

15

The MCS-90 also reads "[t]he insurance policy to which this endorsement is attached is amended . . . to assure compliance by the insured, . . . as a motor carrier of property within Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the DOT, the Federal Highway Administration ("FHWA") and the Interstate Commerce Commission ("ICC")."

Thus, at the time of the accident in this case, the MCS-90 mandated compliance with the MCA and its enabling regulations, including those of the DOT and the FHWA, not just the ICC. Hence, Canal's argument that, because Salguod had a DOT registration but had not requested an ICC registration or operating authority, it had no responsibility to notify the ICC of the cancellation of the Policy rings hollow. First, it is beyond peradventure that Salguod was operating in obstinate violation of federal law. Second, as noted above, Canal issued to Salguod a policy for interstate commerce. Third, Canal was mandated to send notice of cancellation to the DOT, using Salguod's DOT registration number. Finally, inasmuch as Canal was in possession of said DOT registration number, it could have determined, by any simple communication with that agency, exactly to whom the notice of cancellation should be sent, if there existed a true doubt among the decision-makers at Canal. Yet, it never attempted to do so and, instead, chose to give no notification to any federal agency, in violation of the dictates of the MCS-90 endorsement.

In <u>Northland Insurance Company v. New Hampshire Insurance Company</u>, 63 F.Supp.2d 128, 134 (D.N.H. 1999), the court held that

16

once an insurance policy is amended by the attachment of an MCS-90 endorsement, "the coverage provided by the endorsement remains in effect unless it is canceled in a manner prescribed by federal regulations.", *citing* 49 C.F.R. § 387.7(b)(1) and 49 C.F.R.§ 1043.7(d). *Accord* 49 C.F,R. § 387.15 (setting forth model MCS-90 and explanation of all requirements thereof). Section 387.15 provides, in pertinent part, "[e]ndorsements to policies of insurance . . . shall remain in effect continuously until termination in [accordance with mandatory federal regulations]."

Canal's claim that it "has never maintained that it did not have to comply with the MCS-90 endorsement with respect to providing additional notice to Salguod . . . which satisfied <u>both</u> the MCS-90 requirement and the policy requirement (at least ten days notice.)"(emphasis in original) is disingenuous. The MCS-90 requirements cannot be parsed out and "complied with" in any manner favorable to Canal, in its own decision-making process. This argument needs no further comment, except to say it is rejected out of hand.

As noted above, the MCS-90 clearly states that it amends the underlying insurance policy to ensure compliance with the FMCA and the rules and regulations promulgated pursuant to that statute. 49 C.F.R. § 387.15. That is the primary effect of this regulatory endorsement. It is also clear, by an analysis of the legislative history, that *who* is seeking to benefit from its application is critical to its application. "[T]he endorsement [MCS-90] accomplishes its purpose by reading out only those

17

clauses in the policy that would limit the ability of a third party victim to recover for his loss." T.H.E. Insurance Company v. Larsen Intermodel Services, 242 F.3d 667, 673 (5th Cir. 2001). It cannot be disputed, in the present case, that the person seeking benefits pursuant to the MCS-90 is precisely the person for whom the endorsement exists.

Following this plethora of mandatory and persuasive authority, in conjunction with the FMCA, its enabling legislation, all rules and regulations promulgated thereunder, and its purpose stated therein, the Court holds that the MCS-90 endorsement to the Policy was never canceled, under federal law.

In summation: an MCS-90 endorsement must be construed as mandating protection to  members of the public injured by interstate motor carriers from uncompensated losses.  The Plaintiff in this case plainly is a member of the public injured by Salguod and Remmeule and his losses are, to date, uncompensated. The holding of this Court, then, is that, as a matter of federal law as cited herein, Canal's Policy was never canceled.  Thus, Canal must compensate Barbarula, subject to reimbursement by Haniewski and Reummele.

Consequently, Plaintiff's Motion for Partial Summary Judgment [Doc.No.40] is GRANTED.  Partial judgment will be entered for Plaintiff in the amount of the limits of the Policy, $1,000,000, subject to Plaintiff's counsel submitting calculations, if applicable, for any other monies due and owing to Plaintiff, with authority therefore, on or before thirty (30)