UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHAEL JON BARBARULA
Plaintiff

vs   Case No.: 3-02-CV 1142 (EBB)

CANAL INSURANCE COMPANY,   July 19, 2005
Defendant

**DEFENDANT'S SUPPLEMENTAL BRIEF
RE: PLAINTIFF'S MOTION FOR INTEREST**

At oral argument held on July 13, 2006, plaintiff's counsel quoted from the New York Court of Appeals's decision in Pierre v. Providence Washington Insurance Company, 99 N.Y.2d 222, 784 N.E. 2d 52, 754 N.Y.S. 2d 179 (2002). Counsel described the case as a unanimous decision of New York's highest court and the only decision which has considered the question of whether it is possible to differentiate between an insurer's exposure under an auto liability or truckers policy, and its exposure under the form endorsement known as the MCS-90. The court granted Canal's oral request to address this issue more fully in a supplemental brief.

To place the issue in context, the Superior Court of Connecticut (Blue, J.) decided in 2001 that Canal's policy had been cancelled pursuant to state law effective 12:01a.m. on September 12, 1996. For that reason he held that Canal had no duty to defend since such duty can only arise under the terms of the policy, not under the terms of the MCS-90. 2001 WL 1517458 (Conn. Super.) at p. 6. Here is an example (and

more examples follow) of precisely the distinction that counsel claim to have found only in Pierre. Judge Blue explicitly left undecided the question of whether the MCS-90, as opposed to the policy, had been cancelled. ("As mentioned, there is an active, and as yet unresolved, dispute as to whether the MCS-90 endorsement has been cancelled." Id.) That question was answered by this Court in its decision dated September 24, 2004 "[t]he Court holds that the MCS-90 endorsement to the policy was never cancelled under federal law." 353 F. Supp 2d at 256. As set out in Canal's Objection to Motion for Judgment Interest, its exposure is therefore limited to $1 million, the limit referenced in the MCS-90.

Canal's position is based, in part, upon Judge Blue's decision. Judge Blue, though, is not the only judge to point out the difference between the policy and the MCS-90. This distinction between exposure under a policy and exposure under the MCS-90 is explicit in the case law. For instance, the recent Bertrand v. Anguiano, 2006 WL 1793638 (W.D. La.) the United States District Court explicitly distinguished between the form MCS-90 and standard insurance endorsements. Louisiana law requires that whenever a substantive change is made to coverage, a new uninsured motorist ("UMBI") selection/rejection form must be completed by the insured; that is, the insurer may no longer rely on the previous selection/rejection form to limit or deny a UMBI claim. In Bertrand the MCS-90 had been increased from $750,000 to $1 million but no change was made to the policy limits or other policy terms. No new selection/rejection

form was executed. The claimant argued that a change in the MCS-90 was the same as a change in the policy and, therefore, in the absence of a new rejection form, UMBI was available. The District Court rejected the argument. Citing federal case law, the court noted that the MCS-90 is akin to suretyship, not coverage. "The MCS-90 does not alter the insurance policy and, therefore, a new UMBI waiver was not required." Id. at 3. The MCS-90, one must conclude, is nothing like a standard endorsement.

The Supreme Court of Vermont expressed the same view in Fireman's Fund Ins. Co. v. CNA Ins. Co., 177 Vt. 215, 862 A. 2d 251 (2004). That case involved a dispute about the primacy of coverage among three insurers. CNA had argued that Fireman's Fund provided primary coverage because the latter had attached an MCS-90 to its policy. Significantly the court, in rejecting that argument held that the MCS-90, "does not create coverage where there is none," 177 Vt. at 229, citing Progressive Cas. Ins. Co. v. Hoover, 570 Pa. 423, 809 A. 2d 353, 360 n. 11 (2002) (MCS-90 does not create coverage per se). The same point was made by the Sixth Circuit in White v. Ins. Co. of The State of Pa, 405 F. 3d 455, 458 (6th Cir. 2005) (the MCS-90 endorsement "is not insurance," and does not transform an excess indemnity policy into an auto liability policy). Again the key point that emerges is that the MCS-90 does not function in the way that other endorsements do.

Where a policy is cancelled and the attached trucking endorsement remains alive, precisely the situation here, it follows in a fairly straightforward manner that the

terms of the policy are no longer in play. The issue was discussed at length in Truck Insurance Exchange v. E.H. Martin, Inc., 876 S.W. 2d 200 (Tx. App. 1994). In that case, as in ours, the policy was cancelled under the controlling state law, but the motor carrier endorsement was not cancelled (Martin dealt with the state equivalent of the MCS-90, the Form F endorsement: see Kolencik v. Progressive Preferred Ins. Co., 2006 WL 738715 (N.D. Ga. 2006); T.H.E. Insurance Company v. Larsen Intermodal Services, Inc., 242 F. 3d 667, 671 n.1 ("Form F, which is the state counterpart to the MCS-90")). The court noted that once the basic policy was cancelled the only part that remained in effect was the Form F endorsement. 876 S.W. 2d at 204. That distinction - between policy and special endorsement - is precisely what Canal has pointed to in this case. See, also Edwards v. American Home Assurance Co., 361 F. 2d 622, 626-627 (9th Cir. 1962) (basic insurance policy was severable from the motor carrier endorsement, and non-compulsory provisions were cancelled prior to the loss).

Much more in the same vein could be cited, but the point is clear: the MCS-90 is a unique instrument which imposes liability upon the issuing insurer only because the policy itself does not apply (which explains why the courts have unanimously held that the MCS-90 imposes no duty to defend. Harco Nat. Ins. Co., v. Bobac, 107 F. 3d 733, 736 (9th Cir. 1997)).

Plaintiff's citation to the Pierre case does not add much to the discussion. The issue in that case concerned the scope of the MCS-90, specifically whether a judgment

4

against the truck driver, rather then against the motor carrier, triggered the insurer's obligation under the MCS-90. The policy did not apply because the driver had failed to give notice to the insurer. Everyone agreed that the MCS-90 was in force; the question was how to understand the word "insured" in the MCS-90. The court-in a close 4-3 decision with a vigorous dissent - not a unanimous decision - ruled that the word insured in the endorsement was to be interpreted in accordance with the policy definition of "insured" rather than in accordance with the definition found in the regulations which accompany the MCS-90 in the Code of Federal Regulations. From the perspective of the insurance industry that decision is regrettable, but it is only one of over a dozen decisions on this point, most of which have gone the other way (see the dissent). To suggest that <u>Pierre</u> - and only <u>Pierre</u> - offers guidance that this Court should follow is rather a stretch.

Permit Canal to make two observations. On October 5, 2005, the United States Department of Transportation issued what it referred to as "Regulatory Guidance" with respect to the MCS-90, 70 FR 58065 (attached hereto). The Department, which itself promulgated the MCS-90 (49 C.F.R. §387.15), indicates (in footnote 1) that it was responding to the (Appellate level) decision in <u>Pierre</u> and the three other decisions which had understood the word insured in the same manner. In no uncertain terms, the D.O.T. insists that <u>Pierre</u> is wrongly decided. The Form MCS-90 (and the related MCS-90B (the bus endorsement) and the MCS-82 and 82B) are "not intended, and do not

5

purport, to require insurance companies or sureties to satisfy or judgment against any party other than the motor carrier named in the endorsement or its fiduciary."

Secondly, even <u>Pierre</u> did not take the leap that plaintiff urges here. In <u>Pierre</u> the court decided to interpret the MCS-90 with the aid of a policy definition - but it was still interpreting the MCS-90. Plaintiff asks this Court, though, to resuscitate a policy that was properly cancelled and then to interpret that policy to establish the scope of Canal's obligations. There is no case which supports that result.

THE DEFENDANT
CANAL INSURANCE COMPANY

BY /s/ Karen L. Karpie
KAREN L. KARPIE, Esq.
MURPHY and KARPIE, LLC
350 Fairfield Avenue, Suite 408
Bridgeport, CT 06604
Federal Bar #CT 11706
Tel. 203-333-0177, Fax 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
E-mail: klkarpie@sbcglobal.net

## CERTIFICATION

This is to certify that a copy of the foregoing has been faxed and mailed on July 19, 2006 to:

Joel T. Faxon, Esq.
Stratton Faxon
59 Elm St.
New Haven CT 06510

*Karen L. Karpie*
KAREN L. KARPIE

§ 27.5  Frequencies.
* * * * *
(h) *1710–1755 MHz and 2110–2155 MHz bands.* The following frequencies are available for licensing pursuant to this part in the 1710–1755 MHz and 2110–2155 MHz bands:
(1) Three paired channel blocks of 10 megahertz each are available for assignment as follows:
   Block A: 1710–1720 MHz and 2110–2120 MHz;
   Block B: 1720–1730 MHz and 2120–2130 MHz; and
   Block F: 1745–1755 MHz and 2145–2155 MHz.
(2) Three paired channel blocks of 5 megahertz each are available for assignment as follows:
   Block C: 1730–1735 MHz and 2130–2135 MHz;
   Block D: 1735–1740 MHz and 2135–2140 MHz; and
   Block E: 1740–1745 MHz and 2140–2145 MHz.
* * * * *
■ 3. Section 27.6 is amended by revising paragraph (h) to read as follows:

§ 27.6  Service areas.
* * * * *
(h) 1710–1755 and 2110–2155 MHz bands. AWS service areas for the 1710–1755 MHz and 2110–2155 MHz bands are as follows:
(1) Service areas for Block A (1710–1720 MHz and 2110–2120 MHz) are based on cellular markets comprising Metropolitan Statistical Areas (MSAs) and Rural Service Areas (RSAs) as defined by Public Notice Report No. CL–92–40 "Common Carrier Public Mobile Services Information, Cellular MSA/RSA Markets and Counties," dated January 24, 1992, DA 92–109, 7 FCC Rcd 742 (1992), with the following modifications:
   (i) The service areas of cellular markets that border the U.S. coastline of the Gulf of Mexico extend 12 nautical miles from the U.S. Gulf coastline.
   (ii) The service area of cellular market 306 that comprises the water area of the Gulf of Mexico extends from 12 nautical miles off the U.S. Gulf coast outward into the Gulf.
(2) Service areas for Blocks B (1720–1730 MHz and 2120–2130 MHz) and C (1730–1735 MHz and 2130–2135 MHz) are based on Economic Areas (EAs) as defined in paragraph (a) of this section.
(3) Service areas for blocks D (1735–1740 MHz and 2135–2140 MHz), E (1740–1745 MHz and 2140–2145 MHz) and F (1745–1755 MHz and 2145–2155 MHz) are based on Regional Economic Area Groupings (REAGs) as defined by paragraph (a) of this section.
■ 4. Section 27.11 is amended by revising section (i) to read as follows:

§ 27.11  Initial authorization.
* * * * *
(i) *1710–1755 MHz and 2110–2155 MHz bands.* Initial authorizations for the 1710–1755 MHz and 2110–2155 MHz bands shall be for 5 or 10 megahertz of spectrum in each band in accordance with § 27.5(h) of this part.
(1) Authorizations for Block A, consisting of two paired channels of 10 megahertz each, will be based on those geographic areas specified in § 27.6(h)(1).
(2) Authorizations for Block B, consisting of two paired channels of 10 megahertz each, will be based on those geographic areas specified in § 27.6(h)(2).
(3) Authorizations for Block C, consisting of two paired channels of 5 megahertz each, will be based on those geographic areas specified in § 27.6(h)(2).
(4) Authorizations for Blocks D, consisting of two paired channels of 5 megahertz each, will be based on those geographic areas specified in § 27.6(h)(3).
(5) Authorizations for Blocks E, consisting of two paired channels of 5 megahertz each, will be based on those geographic areas specified in § 27.6(h)(3).
(6) Authorizations for Block F, consisting of two paired channels of 10 megahertz each, will be based on those geographic areas specified in § 27.6(h)(3).
■ 5. Section 27.50 is amended by revising paragraphs (d) introductory text and (d)(1) to read as follows:

§ 27.50  Power and antenna height limits.
* * * * *
(d) The following power and antenna height requirements apply to stations transmitting in the 1710–1755 MHz and 2110–2155 MHz bands:
(1) The power of each fixed or base station transmitting in the 2110–2155 MHz band and located in any county with population density of 100 or fewer persons per square mile, based upon the most recently available population statistics from the Bureau of the Census, is limited to a peak equivalent isotropically radiated power (EIRP) of 3280 watts. The power of each fixed or base station transmitting in the 2110–2155 MHz band from any other location is limited to a peak EIRP of 1640 watts. A licensee operating a base or fixed station utilizing a power of more than 1640 watts EIRP must coordinate such operations in advance with all Government and non-Government satellite entities in the 2025–2110 MHz band. Operations above 1640 watts EIRP must also be coordinated in advance with the following licensees within 120 kilometers (75 miles) of the base or fixed station: all Broadband Radio Service (BRS) licensees authorized under part 27 in the 2155–2160 MHz band and all AWS licensees in the 2110–2155 MHz band.
* * * * *

[FR Doc. 05–19761 Filed 10–4–05; 8:45 am]
BILLING CODE 6712–01–P

## DEPARTMENT OF TRANSPORTATION

**Federal Motor Carrier Safety Administration**

**49 CFR Part 387**

[Docket No. FMCSA–2005–22470]

**Regulatory Guidance for Forms Used To Establish Minimum Levels of Financial Responsibility of Motor Carriers**

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.
**ACTION:** Regulatory guidance.

**SUMMARY:** This document presents interpretive guidance material for the Federal Motor Carrier Safety Regulations (FMCSRs). FMCSA issues new regulatory guidance for Forms MCS–90, MCS–90B, MCS–82, and MCS–82B used to establish minimum levels of financial responsibility of motor carriers. The questions and answers are applicable to motor carrier operations on a national basis. This guidance will provide the motor carrier and financial services industries and Federal, State, and local law enforcement officials with a clearer understanding of the applicability in particular situations of Forms MCS–90, MCS–90B, MCS–82, and MCS–82B contained in the FMCSRs.
**EFFECTIVE DATE:** October 5, 2005.
**FOR FURTHER INFORMATION CONTACT:** Ms. Joy Dunlap, Chief, Commercial Enforcement Division, Office of Enforcement and Compliance (MC–ECC), Federal Motor Carrier Safety Administration, 400 Seventh Street. SW., Washington, DC 20590. Phone 202–385–2400. Office hours are from 7:45 a.m. to 4:15 p.m., e.t., Monday through Friday, except Federal legal holidays.
**SUPPLEMENTARY INFORMATION:**

### Basis for the Notice

FMCSA received a petition for rulemaking from several insurance companies and the American Insurance Association to amend Form MCS–90, Endorsement for Motor Carrier Policies

**58066**  Federal Register / Vol. 70, No. 192 / Wednesday, October 5, 2005 / Rules and Regulations

of Insurance for Public Liability, to incorporate several changes, most of which were suggested to clarify the meaning of Form MCS–90. The Trucking Industry Defense Association (TIDA) filed a brief in support of the petition. A copy of the petition, amendments to the petition and the TIDA brief are in the docket identified in the heading of this document. The petitioners contended changes were necessary in light of Federal and State court decisions [1] that they claimed misconstrued Form MCS–90 to require insurance companies to pay damages for negligent operation of a vehicle owned by the insured motor carrier but not covered by its insurance policy, even when no judgment had been obtained against the insured motor carrier. The Petitioners' primary concern was to have the agency clarify that the word "insured" in the Form MCS–90 means "named insured."

FMCSA has denied the petition for rulemaking. However, the agency stated petitioners' concerns could be adequately addressed without rulemaking through formal agency guidance to be published in the **Federal Register.** A copy of the letter denying the petition is in the docket identified in the heading of this document.

**FMCSA Authorities Over Motor Carrier Financial Responsibility Requirements**

Section 30 of the Motor Carrier Act of 1980 (Pub. L. 96–296, July 1, 1980, 94 Stat. 793, at 820), codified at 49 U.S.C. 31139, established minimum levels of financial responsibility for for-hire motor carriers of property involved in interstate or foreign transportation and for the transportation of hazardous materials in intrastate and interstate commerce.

Section 18 of the Bus Regulatory Reform Act of 1982 (Pub. L. 97–261, September 20, 1982, 96 Stat. 1102), codified at 49 U.S.C. 31138, established minimum levels of financial responsibility covering public liability and property damage for the transportation of passengers by for-hire motor carriers in interstate or foreign commerce.

The financial responsibility provisions of the Motor Carrier Act of 1980 and the Bus Regulatory Reform Act of 1982 were intended to create incentives for the motor carrier industry to focus on the safety aspects of highway transportation and to assure the general public that a motor carrier maintains an adequate level of financial responsibility sufficient to satisfy claims covering public liability, property damage liability and, in the case of transporters of hazardous materials, environmental restoration liability.

The Administrator of FMCSA has been delegated authority, under 49 CFR 1.73(f), to carry out the functions vested in the Secretary of Transportation relating to financial responsibility requirements for motor carriers, brokers and freight forwarders. Such functions include issuing regulations implementing 49 U.S.C. 31138 and 31139 and providing guidance regarding statutory or regulatory requirements.

This document provides regulatory guidance to the petitioners and the public with respect to the proper interpretation of Form MCS–90. FMCSA is including Forms MCS–90B, MCS–82, and MCS–82B in this regulatory guidance as well, because the same issue may arise with respect to these forms. Forms MCS–90, MCS–90B, MCS–82, and MCS–82B are not intended, and do not purport, to require insurance companies or sureties to satisfy a judgment against any party other than the motor carrier named in the endorsement or its fiduciary.

Members of the motor carrier industry and other interested parties may also access the guidance in this document through the FMCSA's Internet site at *http://www.fmcsa.dot.gov*.

Specific questions addressing any of the interpretive material published in this document should be directed to the contact person listed earlier under **FOR FURTHER INFORMATION CONTACT**, or the FMCSA Division Office in each State.

**Regulatory Guidance**

**PART 387—MINIMUM LEVELS OF FINANCIAL RESPONSIBILITY FOR MOTOR CARRIERS**

**Sections Interpreted**

*Section 387.15   Forms*

*Question:* Does the term "insured," as used on Form MCS–90, Endorsement for Motor Carrier Policies of Insurance for Public Liability, or "Principal", as used on Form MCS–82, Motor Carrier Liability Surety Bond, mean the motor carrier named in the endorsement or surety bond?

*Guidance:* Yes. Under 49 CFR 387.5, "insured and principal" is defined as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." Form MCS–90 and Form MCS–82 are not intended, and do not purport, to require a motor carrier's insurer or surety to satisfy a judgment against any party other than the carrier named in the endorsement or surety bond or its fiduciary.

*Section 387.39   Forms*

*Question:* Does the term "insured," as used on Form MCS–90B, Endorsement for Motor Carrier Policies of Insurance for Public Liability, or "Principal", as used on Form MCS–82B, Motor Carrier Public Liability Surety Bond, mean the motor carrier named in the endorsement or surety bond?

*Guidance:* Yes. Under 49 CFR 387.29, "insured and principal" is defined as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." Form MCS–90B and Form MCS–82B are not intended, and do not purport, to require a motor carrier's insurer or surety to satisfy a judgment against any party other than the carrier named in the endorsement or surety bond or its fiduciary.

Issued on: September 28, 2005.

Annette M. Sandberg,

*Administrator.*

[FR Doc. 05–19946 Filed 10–4–05; 8:45 am]

**BILLING CODE 4910-EX-P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 660**

[Docket No. 040830250–5062–03; I.D. 093005A]

**Fisheries Off West Coast States and in the Western Pacific; Pacific Coast Groundfish Fishery; Specifications and Management Measures; Inseason Adjustments**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Inseason adjustments to management measures; request for comments.

---

**SUMMARY:** NMFS announces changes to management measures in the commercial and recreational Pacific Coast groundfish fisheries. These actions, which are authorized by the Pacific Coast Groundfish Fishery Management Plan (FMP), will allow fisheries to access more abundant groundfish stocks while protecting overfished and depleted stocks.

---

[1] *John Deere Insurance Co.* v. *Nueva,* 229 F.3d 853 (9th Cir. 2000); *Lynch* v. *Yob,* 95 Ohio St. 3d 441, 768 NE. 2d 1158 (2002); *Pierre* v. *Providence Wash. Ins. Co.,* 286 A.D.2d 139, 730 N.Y.S.2d 550 (2001); and *Madere* v. *National Union Fire Ins. Co. of Pittsburgh,* 2000 U.S. Dist. LEXIS 15994 (E.D. La. 2000).